## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DAWN R. WEST, et al. | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-24-0333 |
| KAREN T. PITMAN, M.D., et al., | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### <u>MEMORANDUM</u>

Pending before the Court are Motions for Summary Judgment filed by Defendants Karen

T. Pitman, M.D. and Johns Hopkins University ("JHU") (ECF No. 95) and Defendant Greater

Baltimore Medical Center, Inc., d/b/a GBMC Health Partners Head & Neck Surgery ("GBMC")

(ECF No. 96) (collectively, "the Movant Defendants"). The Motions are fully briefed, and no

hearing is required. *See* Local Rule 105.6 (D. Md. 2025). For the reasons that follow, the Motions

will be granted in part and denied in part: summary judgment will be granted in favor of the Movant

Defendants on Plaintiffs' claim for failure to obtain informed consent, but Plaintiffs' claims for

medical malpractice and loss of consortium will survive.

### I.    BACKGROUND

Plaintiffs, a married couple from Delaware, filed this medical malpractice action in

February 2024, alleging that Defendants negligently caused a delay in the diagnosis and treatment

of adenoid cystic carcinoma in Plaintiff Dawn R. West's ("Mrs. West's") parotid gland. (ECF No.

1.) Plaintiffs brought claims for negligence, failure to obtain informed consent, and loss of

consortium against three individuals—Karen T. Pitman, M.D., Daniel J. Kelley, M.D., and Robert

M. Grill, D.D.S.—and four medical practices—JHU, Eastern Shore ENT & Allergy Associates,

P.A. ("Eastern Shore"), TMJ/Facial Pain Center, LLC ("TMJ"), and GBMC. (*Id.*) All seven Defendants answered (ECF Nos. 6, 7, 16, 18), and the case proceeded to discovery.

In September 2024, Defendants Dr. Grill and TMJ filed a third-party complaint against Julian Thayer Simmons, M.D., and Advanced Radiology, P.A. ("Advanced Radiology"), for indemnification and/or contribution. (ECF No. 36.) And in January 2025, Plaintiffs filed an action (Civ. No. 25-00292) alleging negligence and loss of consortium against Dr. Simmons and Advanced Radiology directly, which has been consolidated with this case. (ECF No. 59.) At the Court's direction, Plaintiffs filed an Amended Complaint (ECF No. 81), making no substantive changes but combining the factual allegations and legal contentions from their two previous complaints, and Dr. Simmons and Advanced Radiology answered (ECF No. 84). Discovery in the consolidated case closed on August 15, 2025. (ECF Nos. 83, 91, 92.)

The crux of Plaintiffs' factual allegations is as follows: "Over the course of several years from 2018–2021, Mrs. West was seen by the Defendants for swelling and tenderness over her right preauricular area (i.e., facial region in front of the ear) and right-sided jaw and ear pain. . . . [T]he standard of care required the Defendants to have a high clinical suspicion for parotid gland cancer [and to] recommend, order, and/or perform a complete and thorough oncological work up . . . . [But instead,] Defendants negligently concluded—without recommending, ordering, and/or performing a complete and thorough oncological work up—that Mrs. West's [symptoms] were not caused by cancer . . . [which caused] a significant delay in the diagnosis and treatment of Mrs. West's parotid gland cancer. . . . allow[ing it] to progress, grow, and spread to the point of causing injury and becoming incurable metastatic cancer." (ECF No. 81 ¶ 16.)

Dr. Pitman and JHU's Motion for Summary Judgment argues that Plaintiffs' claims against them fail as a matter of law for three reasons: (1) Plaintiffs cannot establish the causation element of their negligence claim because there is no evidence that the diagnostic radiology scans Plaintiffs

argue Dr. Pitman should have ordered would have revealed Mrs. West's cancer before it progressed to stage 3; (2) Plaintiffs' informed consent claim relies on a legal theory that was recently rejected by the Appellate Court of Maryland, which clarified that such claims should be addressed through the traditional medical negligence framework; and (3) all of Plaintiffs' claims are barred by the applicable statute of limitations, which began running in 2019 when Plaintiffs were first dissatisfied with Dr. Pitman's treatment—more than three years before the February 2024 filing of this lawsuit. (ECF No. 95-1 at 5.) GBMC adopts and fully incorporates Dr. Pitman and JHU's Motion, adding only that "[b]ecause Plaintiffs' claims against GBMC are based solely on the alleged negligence of Dr. Pitman, and because Dr. Pitman is entitled to summary judgment, GBMC is likewise entitled to summary judgment." (ECF No. 96.)

## II.    LEGAL STANDARDS

To prevail on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute as to any material fact and that she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In proving the presence or absence of a genuine dispute, either party may point to materials in the record, such as admissions, stipulations, depositions, documents, and electronically stored information. Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating the absence of any genuine dispute of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). If the movant meets this burden, then the nonmoving party cannot rest on mere denials but must point to specific facts showing there is a genuine triable issue in the case. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003). In determining whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

3

### III.   ANALYSIS

Plaintiffs' claims against the Movant Defendants primarily concern treatment Mrs. West received from Dr. Pitman in August 2019.  However, treatment Mrs. West received from other providers both before and after August 2019 is relevant to the Movants' arguments.  The following facts are undisputed except where otherwise noted.

In November 2018, Mrs. West presented to her primary care physician complaining of swelling and pain in her right preauricular area—the part of the face in front of the ear—which had worsened in the preceding six months.  (ECF No. 95-1 at 5.)  Mrs. West had a history of thyroid cancer, which was first diagnosed in 1999 and treated subsequently with surgery and radioactive iodine.  (*Id.*)  In November 2018, Mrs. West's primary care physician ordered a Positron Emission Tomography (PET) scan, though the scan was never performed—Mrs. West's insurance denied coverage, and paying out of pocket for the scan was a financial impossibility.  (*Id.* at 6.)  Instead of a PET scan, a CT scan of Mrs. West's neck was performed.  (*Id.*)  A non-party radiologist read the scan, and his report noted normal parotid glands but also suspicious lymph nodes.  (*Id.*)  Plaintiffs' expert witnesses opine—contrary to the report of the non-party radiologist who read the scan at the time—that a tumor *is* visible in the right parotid gland on the November 2018 CT scan.  (*Id.*)

In August 2019, Mrs. West's primary care physician referred her to Dr. Pitman, an otolaryngologist (ENT).  (*Id.*)  Dr. Pitman reviewed the report from the November 2018 CT scan and suspected that Mrs. West was experiencing right temporomandibular joint (TMJ) tenderness/pain, lymphedema, and radioiodine-related sialadenitis.  (*Id.*)  Dr. Pitman referred Mrs. West to an endocrinologist for follow-up for her thyroid cancer, an oral and maxillofacial surgeon to address her TMJ symptoms, and for lymphedema therapy.  (*Id.*)  Dr. Pitman did not suspect parotid gland cancer; did not order a PET scan, Magnetic Resonance Imaging (MRI), or

4

ultrasound; and did not discuss with Mrs. West the advisability of doing so. (*Id.* at 6, 8, 15–16.) Plaintiffs' expert opines that Dr. Pitman should have ordered one of these diagnostic exams, consistent with the standard of care. (*Id.* at 11.)

In July 2020, Mrs. West underwent an MRI ordered by Defendant Dr. Grill, a dentist. (*Id.* at 7.) Defendant radiologist Dr. Simmons read the MRI and did not identify any masses in the parotid area. (*Id.*) Plaintiffs' experts opine—contrary to Dr. Simmons—that a parotid mass meeting Stage 2 sizing criteria is visible on the July 2020 MRI. (*Id.*)

In April 2022, during a fluid-draining procedure, a nonparty oral and maxillofacial surgeon encountered a mass in Mrs. West's right preauricular area. (*Id.*) In May 2022, an MRI and biopsy were obtained and were consistent with adenoid cystic carcinoma. (*Id.*) In August 2022, Mrs. West had surgery—a parotidectomy/facial nerve decompression/mastoidectomy—and pathology results were consistent with Stage 3 adenoid cystic carcinoma, based on both the size of the tumor and the presence of regional lymph node involvement. (*Id.*) Plaintiffs' experts opine that the likelihood of "metastasis, recurrence, and death" resulting from adenoid cystic carcinoma is less than 50% at Stage 1 or 2, but more than 50% at Stage 3. (ECF Nos. 97-2 at 7, 97-5, 97-6.) Plaintiffs' expert opines that Mrs. West's cancer likely progressed to Stage 3 in or around May 2022, shortly before her diagnosis. (ECF Nos. 97-2 at 7, 97-5.)

## A.    Negligence and Causation

The Movant Defendants argue first that they are entitled to summary judgment on Plaintiffs' negligence claim. To establish negligence under Maryland law, a Plaintiff must show: (1) that the defendant owed a duty to the person who was injured; (2) that the defendant breached that duty; (3) that an actual injury or loss existed; and (4) that the injury or loss proximately resulted from the defendant's breach of the duty. *Copsey v. Park*, 160 A.3d 623, 636 (Md. 2017). In medical malpractice claims, the defendant's duty is based on the applicable standard of care. *Am.*

5

*Radiology Servs., LLC, v. Reiss*, 236 A.3d 518, 579 (Md. 2020) (A "physician is under a duty to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he [or she] belongs, acting in the same or similar circumstances.") (citation omitted).

Plaintiffs' theory of Dr. Pitman's negligence is that she violated the standard of care by failing to order at least one of three diagnostic studies—a PET scan, MRI, or ultrasound—for Mrs. West in August 2019. (ECF No. 97-2 at 6.) The Movant Defendants argue that they are entitled to judgment as a matter of law because no reasonable jury could find that this alleged breach of duty was the proximate cause of Mrs. West's injuries. (ECF No. 95-1 at 9–15.)

To be the proximate cause of a plaintiff's injury, a defendant's conduct must be both a cause in fact and a legally cognizable cause. *Copsey*, 160 A.3d at 636.   Causation-in-fact concerns whether a defendant's conduct actually produced an injury. *Id.* "When two or more independent negligent acts bring about an injury, the substantial factor test controls.  Causation-in-fact may be found if it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* (citation omitted).   Legally-cognizable-causation, by contrast, concerns whether the plaintiff's injuries "fall[] within a general field of danger that the actor should have anticipated or expected." *Id.* at 637.  An otherwise negligent defendant can be relieved from liability if an intervening negligent act or omission is a "superseding cause" of the plaintiff's injury. *Id.* A superseding cause exists where an "unusual and extraordinary independent intervening negligent act occur[s] that could not have been anticipated by the original tortfeasor." *Id.*

According to the Movant Defendants, "Plaintiffs cannot establish that Dr. Pitman's alleged breach in the standard of care was a cause-in-fact, because A) at the time of Dr. Pitman's care, a PET scan had *already* been ordered in response to Ms. West's symptoms but was not obtained due to coverage issues, and B) CT and MRI scans were obtained and did not diagnose parotid cancer .

6

..." (ECF No. 95-1 at 11.)  Movant Defendants argue that Plaintiffs must establish, but have no evidence to support, that "a PET scan, if ordered by Dr. Pitman, would have been approved and paid for, effectuating an earlier diagnosis of Ms. West's cancer" (*id.* at 13), and that a PET scan, MRI, or ultrasound, if ordered by Dr. Pitman, "would have been . . . interpreted as showing parotid cancer" (*id.* at 15).  After all, "three purportedly diagnostic studies were ordered during the time that Plaintiffs claim Ms. West's cancer was still curable, yet none lead to a diagnosis." (*Id.*)

The Movant Defendants rely principally on *Langville v. Glen Burnie Coach Lines, Inc.*, 195 A.2d 717 (Md. 1963), in arguing that "Plaintiffs must exclude the lack of insurance coverage and the interpretations of [the 2018 CT scan and the 2020 MRI] as showing no cancer as independent causes of Ms. West's injuries" (*id.*) to establish causation-in-fact.  In *Langville*, the Maryland Court of Appeals held that a bus owner could not be held liable for injuries sustained by a passenger where the plaintiff passenger's evidence was sufficient to establish only that the injury resulted "*either* from the negligence of the defendant *or* from an independent cause for the existence of which the defendant [was] in no way responsible." 195 A.2d at 719 (citation omitted).  Because the plaintiff passenger could not "eliminate brake failure as the efficient and proximate cause of the injuries complained of," she could not establish that the bus driver's alleged negligent driving was a proximate cause. *Id.* at 720.  Similarly here, Movant Defendants argue, because Plaintiffs cannot "exclude the lack of insurance coverage and the interpretations of [the 2018 CT scan and the 2020 MRI] as showing no cancer as independent causes" (ECF No. 95-1 at 15), they cannot establish that Dr. Pitman's failure to order a PET scan, MRI, or ultrasound was a proximate cause of Mrs. West's injuries. (*Id.*)

Plaintiffs respond with three counterpoints: First, Plaintiffs argue that they need not show that Mrs. West's insurance would have covered an August 2019 PET scan, because if it did not, then the standard of care would require Dr. Pitman to have ordered an MRI or an ultrasound. (ECF

No. 97-2 at 7–8.)  Second, Plaintiffs argue that the November 2018 CT scan is irrelevant, since "Plaintiffs' experts have stated that, notwithstanding the November 2018 CT scan, Dr. Pitman had an obligation to order new testing, which she failed to do." (*Id.* at 8–9.)  And third, Plaintiffs argue that whether or not the July 2020 MRI (that they allege was misread by Defendant Dr. Simmons) breaks the causal chain connecting Dr. Pitman's alleged negligence to Mrs. West's delayed diagnosis is appropriately analyzed as a question of whether Dr. Simmons' alleged negligence was a superseding intervening cause, which question has generally been held to be one for a jury. (*Id.* at 9–10.)

The Court concurs with Plaintiffs on all three points.  A reasonable jury could find, based on the evidence now in the record, that Dr. Pitman's conduct was a proximate cause of Mrs. West's injuries.  Unlike in *Langville*, there is evidence in the record to support a finding that the plaintiff's injuries were caused (in fact) by the defendant's alleged negligence in particular, not by *either* that negligence *or* someone else's.  Specifically, Plaintiffs will present evidence that if Dr. Pitman had ordered one of the three tests at issue, they would have been diagnostic of cancer and thereby prevented her delayed diagnosis.  Plaintiffs' expert testified at deposition:

> I believe that . . . the symptoms Ms. West presented with, the complaints, [the] duration, were of sufficient concern that warranted further workup.  How you want to define that workup, whether it would be with an ultrasound, and MR [sic], or with a PET scan, that would be left up to the individual practitioner.  But all of those methodologies would, or any of those methodologies would[,] to a greater degree of likelihood than not[, have] been diagnostic for a parotid cancer.

(ECF No. 95-10 at 4.)  This evidence provides a reasonable basis for a finding of causation in fact—if Plaintiff's expert is to be believed, "it is more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Copsey*, 160 A.3d at 636.

The Court concurs with Plaintiffs that the relevance of the 2018 CT scan is far from obvious—a CT scan is not one of the three kinds of study Plaintiffs allege Dr. Pitman should have ordered, and it was obtained and read almost a year before the hypothetical study Dr. Pitman could

8

have ordered in 2019. But even if the 2018 CT scan somehow undermines Plaintiffs' evidence that a 2019 PET scan, MRI, or ultrasound would have been diagnostic of cancer, it does nothing more than create a disputed issue of material fact. It does not provide a basis for judgment as a matter of law on this issue. Further, the Court finds that the relevance of the 2020 MRI is exactly as Plaintiffs assert—the legally significant question is whether it was a superseding intervening cause sufficient to deprive Dr. Pitman (and the other Movant Defendants) of liability.

Subsequent medical malpractice does not necessarily constitute a superseding cause that excuses an earlier negligent actor from liability. *See Insley v. Wexford Health Sources, Inc.*, Civ. No. 1:22-00854-JMC, 2023 WL 4108268, at \*7 (D. Md. June 21, 2023). Rather, Maryland courts apply a factor test from Section 442 of the Restatement (Second) of Torts in evaluating whether a later intervening cause—such as Dr. Simmon's alleged negligence in misreading the 2020 MRI— constitutes a superseding cause. *Copsey*, 160 A.3d at 637. This test examines (a) whether the intervening cause "brings about harm different in kind from that which would otherwise have resulted," (b) whether the operation or consequences of the intervening cause "appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation," (c) whether the intervening force "is operating independently of any situation created by the actor's negligence, or, on the other hand, is . . . a normal result of such a situation," (d) whether the operation of the intervening force "is due to a third person's act," (e) whether the intervening force "is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability," and (f). "the degree of culpability of a wrongful act of a third person which sets the intervening force in motion." *Id.*

The Movant Defendants have not presented undisputed evidence establishing the wrongfulness of Dr. Simmons' alleged negligence or the extent to which Dr. Simmons' alleged conduct was extraordinary or entirely foreseeable. Given this, summary judgment on Plaintiffs'

negligence claim is inappropriate and the question should be reserved for the finder of fact. *See Copsey*, 160 A.3d at 642 (finding "the evidence was for the jury to weigh in determining whether . . . intervening actions of subsequent treating physicians were independent and superseding causes"); *Insley*, 2023 WL 4108268, at \*5 ("Whether the intervening act of a third party suffices as a superseding cause is generally for the trier of fact to determine."). For these reasons, the Motions for Summary Judgment will be denied as to Plaintiffs' negligence claim.

### B. Informed Consent

The Movant Defendants also argue that they are entitled to summary judgment on Plaintiffs' claim for failure to obtain informed consent. Both ordinary medical negligence and failure to obtain informed consent are rooted in negligence, but they are different legal theories. *Street v. Upper Chesapeake Med. Ctr., Inc.*, 311 A.3d 321, 336 (Md. App. 2024). Ordinary medical negligence relies on a duty "to use that degree of care and skill which is expected of a reasonably competent practitioner acting in the same or similar circumstances." *Id.* (citation omitted). Informed consent, by contrast, rests on a duty to provide sufficient information to enable a patient to "decide for himself whether or not to submit to [a] particular therapy." *Id.* (citing *Sard v. Hardy*, 379 A.2d 1014, 1022 (Md. 1977)). The doctrine of informed consent imposes a duty "to make an adequate disclosure of substantial facts which would be material to a Patient's decisions." *Sard*, 379 A.2d at 1019.

Plaintiffs' Amended Complaint alleges that Dr. Pitman's failure to obtain informed consent consisted of her failure to disclose to Mrs. West "the benefits of undergoing a timely, thorough, and complete oncological work up, . . . the benefits of undergoing a PET scan, referral to appropriate specialists and other appropriate tests, studies, and procedures," and in failing to "explain in detail to Mrs. West the material risks and negative consequences of parotid gland cancer or other salivary gland cancers." (ECF No. 81 ¶ 46.) "Had [Dr. Pitman] timely, adequately

10

and properly offered, informed, advised and explained alternative diagnostic/treatment plans, including, *inter alia*, having a complete oncological work up, undergoing a PET Scan and being evaluated by appropriate medical specialist(s), a reasonable person in Mrs. West's position would not have consented to undergo [Dr. Pitman's] proposed diagnostic/treatment plan." (*Id.* ¶ 47.)

The Movant Defendants argue that because Plaintiffs' claim

> alleges a failure to inform of treatment options the provider did not believe were indicated, it is duplicative of Plaintiffs' medical negligence claim, and should be disposed of consistent with the Appellate Court of Maryland's opinion in *Street* . . . ("[I]f the gravamen of a claim is that the physician should have recommended certain treatment options, and not doing so was a breach of the standard of care, the path to vindicate that wrong is a claim for ordinary medical negligence, not informed consent.").

(ECF No. 95-1 at 15–16.)

In *Street*, the plaintiff presented at an emergency room with a cyanotic foot without a palpable pulse. 311 A.3d at 646. The defendant physician did not identify any evidence of emergent vascular compromise and recommended consultation with a vascular surgeon in three to five days. *Id.* at 347. Two days later, the plaintiff returned to the emergency room with worsening symptoms and ultimately required a below-the-knee amputation. *Id.* at 349. Plaintiff asserted both ordinary medical negligence and a claim for failure to obtain informed consent, arguing that the defendant physician should have advised her as to treatment options such as "immediate consultation by a vascular surgeon, immediate admission to the Hospital, and anticoagulation therapy." *Id.* at 660–61. The trial court granted judgment as a matter of law to the defendant physician on the informed consent claim, on the grounds that it was merely a restyled duplication of her ordinary medical negligence claim, and the Appellate Court affirmed. *Id.* at 679. The Appellate Court endorsed out-of-state authority reasoning that the idea that a physician might "ha[ve] a duty to obtain informed consent for a non-recommended treatment modality is nonsensical and creates an unnecessary and untenable basis of liability." *Id.* at 669 (citing, *inter*

11

*alia, Vandi v. Permanente Med. Grp., Inc.*, 9 Cal. Rptr. 2d 463 (Cal. Ct. App. 1992)). Rather, where a failure to recommend appropriate treatment is the core of the plaintiff's claim, ordinary medical negligence is the legal theory by which she may pursue her claim. *Id.*

The Court agrees that *Street* is structurally analogous to the present case and militates in favor of granting summary judgment to Movant Defendants on this claim. The duty to obtain informed consent arises primarily in relation to the treatment or course of treatment a physician believes is indicated and is therefore proposing, not in relation to all other possible treatments she believes are *not* indicated and does not recommend. *See, e.g., Sard*, 379 A.2d at 1020 ("[T]he doctrine of informed consent imposes on a physician, before he subjects his patient to medical treatment, the duty to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment."). Both here and in *Street*, the physician's failure to advise as to particular therapies resulted from a failure to believe that such therapies were indicated, and plaintiff's fundamental allegation of insufficiency attaches to the conclusion that these alternative therapies were not indicated. Where this is the case, the informed consent claim merely duplicates the ordinary negligence claim and can be resolved on those grounds. *Street*, 379 A.2d at 347.

Plaintiffs' only argument to the contrary is that the undisputed evidence demonstrates that Dr. Pitman *did* believe additional imaging was indicated—she "made a referral to an endocrinologist and a referral to an oral maxillofacial surgeon . . . among other things, [to] determine if other imaging might be indicated." (ECF No. 97-2 at 12.) This is in contrast to *Street*, according to Plaintiffs, where the physician "did not believe the patient required further work up." (ECF No. 97-2 at 13.) Given Dr. Pitman's assessment that further work up was necessary, she

12

should have, but did not, "explain[] that Mrs. West should consider undergoing additional imaging, specifically a PET scan, an MRI, or an ultrasound." (*Id.*)

But this argument fails as it trades on the vagueness of "additional imaging" and "further work up." As the Movant Defendants rightly note, "[t]he physician in *Street did* believe that the Plaintiff required further work up," just not the specific work up the plaintiff alleged the physician should have recommended—the physician recommended follow up with a vascular surgeon in three to five days, rather than immediately. (ECF No. 100 at 13.) Nevertheless, this did not generate a duty to advise as to the possibility of immediate consultation. Similarly here, the fact that Dr. Pitman believed further imaging was appropriate —in the form of follow up with endocrinology—does not entail that she should have advised Mrs. West as to the possibility of distinct further imaging—in the form of a PET scan, MRI, or ultrasound. Plaintiffs' fundamental complaint is that Dr. Pitman failed to suspect that Mrs. West may have cancer in her parotid gland and accordingly failed to recommend those diagnostic studies that would have timely identified it. Plaintiffs will be permitted to pursue this claim as an ordinary medical negligence claim, but following *Street*, the Court finds that Plaintiffs' claim against the Movant Defendants for failure to obtain informed consent is duplicative, and the Movant Defendants' Motions for Summary Judgment will therefore be granted as to this claim.

## C.   Statute of Limitations

Movant Defendants' final argument is that they are entitled to summary judgment on the grounds that Plaintiffs' claims are untimely. In Maryland, medical malpractice claims must be filed within the earlier of "five years of the time the injury was committed; or three years of the date the injury was discovered." Md. Code Cts. & Jud. Proc. § 5-109. The statute of limitations period begins to run "from the time a right of action accrues." *Russo v. Ascher*, 545 A.2d 714, 716 (Md. Ct. Spec. App. 1988). Further, Maryland recognizes the "discovery rule," whereby a cause

13

of action accrues when the claimant "first knew or reasonably should have known of the alleged wrong." *Id.*

The Movant Defendants argue that the three-year provision applies here and that Plaintiffs' February 2024 lawsuit is untimely because "Plaintiffs were on inquiry notice as soon as they left Dr. Pitman's office on August 30, 2019" since they "left the visit with Dr. Pitman unsatisfied with her recommendations." (ECF No. 95-1 at 19.) Movant Defendants assert that even though "Plaintiffs were not aware of parotid cancer as the *cause* of Ms. West's symptoms in August of 2019," nevertheless their dissatisfaction with Dr. Pitman's treatment and their "knowledge of a potential 'wrong' started the statute of limitations clock" at that time. (*Id.* at 21.) Movant Defendants cite deposition testimony from Mr. West stating that

> [t]he PET scan was a common topic amongst all of those doctors. Frankly, PET or otherwise, that was a topic that we brought up with every doctor we saw because we felt from the start that [Mrs. West's primary care physician] was not permitted to do the scan that she needed to do to send us down the right path from the get-go,

and admitting that he and Mrs. West "were not satisfied with [Dr. Pitman's] response" "when the appointment with Dr. Pitman occurred." (ECF Nos 95-1 at 19, 95-8.)

Movant Defendants rely principally on two cases for the proposition that even where a plaintiff is "not aware of the *cause* of their symptoms, . . . the statute of limitations [is] still triggered when the plaintiff believe[s] a 'wrong' had occurred" (ECF No. 100 at 5): *Sisters of Mercy v. Gaudreau, Inc.*, 423 A.2d 585 (Md. Ct. Spec. App. 1980); and *Lutheran Hospital of Maryland v. Levy*, 482 A.2d 23 (Md. Ct. Spec. App. 1984). In *Sisters of Mercy,* the plaintiffs hired a contractor to build a retirement home. 423 A.2d at 586. Once construction was complete, the plaintiffs discovered defects, including that the roof was leaking. *Id.* Although the plaintiffs "were not aware of either the source of the leak or the responsibility for it," *id.*, their eventual suit seeking damages for the leak, filed more than three years later, was untimely because "[t]hey knew that there was leakage [and that] the roof should not have leaked" and "[b]y the exercise of reasonable

14

diligence, they could have ascertained the cause and the responsibility." *Id.* at 588. Similarly, in *Lutheran Hospital*, a plaintiff's suit for damages resulting from improper casting of a broken ankle was untimely because "[n]o new facts necessary to support the cause of action occurred" after she "first formed the belief that there was a problem" more than three years prior to filing suit. 482 A.2d at 25, 29. After visiting the hospital, where her ankle was put in a cast and she was eventually instructed to walk on the ankle, plaintiff was "put upon inquiry" when she saw a different doctor who said her ankle "was all messed up." *Id.* at 29. "Even though the wrong she then thought existed (being told to walk on the ankle) was not the wrong ultimately established (improper casting)," still the statute of limitations began running because "reasonably prompt investigation would have developed [the] precise nature [of the wrong]." *Id.* at 27, 29.

But these cases are importantly distinct from the case at hand. The deposition testimony Movant Defendants cite is insufficient to support a finding, as a matter of law, that in August of 2019, Mrs. and Mr. West believed that a wrong occurred, the nature or cause of which they were obligated to investigate. In August 2019, though they may have been "not satisfied with [Dr. Pitman's] response," there is no indication that Plaintiffs believed Mrs. West had parotid gland cancer, or any other cancer, or even that she had an unknown condition that Dr. Pitman was failing to appropriately diagnose. Unlike the plaintiffs in *Sisters of Mercy* and *Lutheran Hospital*, who knew that the roof was and shouldn't be leaking, or that her ankle was "all messed up," Plaintiffs did not know in August of 2019—at least insofar as the evidence now before the Court shows— that Mrs. West had a medical problem that was going undiagnosed or that she had reason to undertake an investigation that would have revealed as much.

Indeed, the surrounding passages of Mr. West's deposition testimony that Movant Defendants include in their exhibit but do not cite or discuss show that Movant Defendants cannot credibly ascribe such knowledge to Plaintiffs in 2019. When asked "[W]as the reason for your

15

dissatisfaction [with Dr. Pitman at the time], as you were concerned that she was overlooking a potential for cancer?" Mr. West answered:

> We felt handed off and we – we needed an answer. And so we were – we were following through with Dr. Pitman's recommendations regardless of how we felt about how that visit went, because – well, because it was unresolved, and so we needed a resolution. She was still in pain.

(ECF No. 95-8.) This answer falls far short of an unequivocal "yes." And when he was asked "Do you remember any discussions that were raising the concept of – of cancer? Like, we're – we're worried this could be cancer, or anything like that, that you all were raising with Dr. Pitman?" Mr. West answered:

> I believe so because of Dawn's history, the nature of – you know, Tell me how you got here. That's – that was – that was our conversation. That was part of our – it was part of our vernacular, our story, our – yeah.

(*Id.*) This response is far from a clear statement that indeed Plaintiffs suspected in August 2019 that Dr. Pitman was failing to appropriately diagnose what they suspected was cancer, or that they had discussions to that effect with Dr. Pitman.

Thus, viewed in the light that is most favorable to the non-movant Plaintiffs, the evidence is insufficient to support a finding that the statute of limitations began running in August 2019. Rather, a reasonable jury could conclude that Plaintiffs only realized that a wrong and a cause of action existed in the summer of 2022 when Mrs. West was first diagnosed with parotid gland cancer. This would render the present suit timely, and summary judgment on grounds of the statute of limitations will therefore be denied.

## IV.   CONCLUSION

For the foregoing reasons, summary judgment will be granted in favor of the Movant Defendants on Plaintiffs' claim for failure to obtain informed consent, but Plaintiffs' claims for medical malpractice and loss of consortium will survive.

16

DATED this _5_ day of May, 2026.

BY THE COURT:

James K. Bredar
United States District Judge